UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KENNETH WICKENDEN and
SHANNON WICKENDEN,

                  Plaintiffs,

     -against-                        1:17-CV-1056 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE PLASTICS
CORP., *et al.*,

                  Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

This action is one of several before the Court stemming from the contamination of groundwater with perfluorooctanoic acid ("PFOA") in the Village of Hoosick Falls, New York. Dkt. No. 59 ("Amended Complaint") ¶ 153. Plaintiffs Kenneth and Shannon Wickenden allege that defendants Saint-Gobain Performance Plastics Corp. and Honeywell International Inc. (together, the "McCaffrey Site Defendants") contaminated the Village's groundwater and ambient air by discharging PFOA from a facility they operated, which is located in the Village at 14 McCaffrey Street ("McCaffrey Site"). Id. ¶¶ 126, 136, 148–49. Plaintiffs also allege that, from the 1950s through 2015, defendants 3M Co. and E.I. DuPont deNemours and Company manufactured and sold PFOA and PFOA-containing products to the McCaffrey Site Defendants, were aware of numerous health and environmental risks associated with PFOA, and failed to provide adequate warnings regarding these risks. Id. ¶¶ 213–16. According to Plaintiffs, 3M and DuPont's failure to provide warnings related to PFOA, and the McCaffrey Site Defendants' negligent discharge of PFOA from their facility, led to the contamination of the Village's air and

water, causing Kenneth to develop kidney cancer and Shannon to develop significant

bioaccumulation of PFOA. Id. ¶¶ 204, 209. Presently before the Court are motions to dismiss the

Amended Complaint filed by DuPont, Dkt. No. 65 ("DuPont Motion"), the McCaffrey Site

Defendants, Dkt. No. 66 ("McCaffrey Site Defendants' Motion"), and 3M, Dkt. No. 67 ("3M

Motion"). For the reasons that follow, Defendants' Motions are denied.

## II.    BACKGROUND

### A.  Factual Background

The following facts are taken from the allegations in the Amended Complaint, which are

assumed to be true when deciding a motion to dismiss for failure to state a claim. Bryant v. N.Y.

State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012).

PFOA is a human-made chemical that is used "to achieve water, oil, and grease

repellency" in "consumer products," including cookware, fabrics, clothing, and carpets. Am.

Compl. ¶¶ 17, 21–22. PFOA is also used in the process of making Teflon. Id. ¶ 23. According to

Plaintiffs, "[t]here are a number of health risks associated with exposure to PFOA, and these

risks are present even when PFOA is ingested at, seemingly, very low levels." Id. ¶ 27. Studies

indicate that people exposed to PFOA have a heightened risk of numerous illnesses, including

kidney cancer and thyroid disease. Id. ¶ 94.

### 1.  3M and DuPont's Knowledge of PFOA-related Harms

Plaintiffs allege that, from the 1950s through 2000, 3M manufactured and sold PFOA to

DuPont and to the McCaffrey Site Defendants. Id. ¶ 213. From the 1950s through 2015, DuPont

manufactured and sold "PFOA-containing . . . products . . . to other manufacturers . . . and

to . . . Honeywell and Saint-Gobain." Id. ¶ 214. In 2000, 3M ceased its manufacturing of PFOA

after the United States Environmental Protection Agency ("EPA") informed 3M that it would "pursue more rigorous regulation of" 3M's manufacturing of PFOA. Id. ¶ 85.

By 1962, DuPont researchers discovered that rats, rabbits, and dogs exposed to PFOA had developed enlarged livers. Id. ¶ 29. By 1978, DuPont discovered that its employees who had "long-term exposure to PFOA" had "abnormal liver function tests." Id. ¶ 35. In 1979, DuPont learned that monkeys and rats exposed to PFOA had an increased prevalence of kidney damage, hyperkeratosis, and liver damage. Id. ¶ 42. That same year, DuPont learned of a "90-day oral study" in which experimental groups of monkeys were exposed to varying dosage levels of PFOA. Id. ¶ 43. The monkeys receiving the highest dose (100 mg/kg/day) died in the first five weeks of the study, three monkeys receiving the 30 mg/kd/day dose died during weeks 7–12 of the study, and "all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract." Id. In 1980, 3M commissioned "PFOA toxicology studies," which revealed that PFOA had an adverse impact on the liver. Id. ¶ 44.

"By the early 1980's, . . . DuPont and 3M were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA." Id. ¶ 52. By 1982, DuPont learned that "40% of the PFOA vapor inhaled was retained in the blood of human males." Id. ¶ 53. In 1986, DuPont learned of a "cancer morbidity study among" DuPont employees at one of its facilities which revealed that these employees "had an incidence of bladder cancer deaths at more than double what would have been expected." Id. ¶ 60. Through studies of its employees and animal studies in the mid-1980s, DuPont learned that people and animals exposed to PFOA had a heightened risk of several forms of cancer. Id. ¶¶ 61, 63. In 1990, DuPont conducted an "industrial hygiene data review," which found that "PFOA bioaccumulated inside the body." Id.

¶ 69. DuPont and 3M conducted and reviewed several other studies in the 1990s that similarly suggested that humans exposed to PFOA accumulate the substance in their bodies over time, id. ¶ 83. Plaintiffs allege that, in addition to the studies performed by 3M and DuPont, "[t]oxicology studies show that PFOA . . . is associated in the medical literature with increased risk in humans of" many types of cancer—including kidney cancer—as well as "high cholesterol [and]  high uric acid levels." Id. ¶¶ 93–94.

Plaintiffs also allege that 3M and DuPont had long been aware that PFOA could contaminate groundwater. In the mid-1960s, DuPont learned that PFOA could "move rapidly in groundwater and migrate into nearby bodies of water." Id. ¶¶ 96–97. Moreover, in a 1975 internal memo, DuPont acknowledged that PFOA placed in a landfill could leach into the groundwater, and stated, "[f]or this reason, we have elected to not landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present." Id. ¶ 98. In 1984, DuPont learned "that PFOA in particulate form exhausted from stacks at" its Washington Works plant in Virginia was carried in the wind until it settled "in the soil throughout the community." Id. ¶ 101. DuPont also learned, after performing several studies in the 1980s, that PFOA had contaminated the drinking water in the communities near the Washington Works plant. Id. ¶¶ 101–04. Plaintiffs allege that, "[u]pon information and belief, 3M and DuPont shared information about the environmental contamination potential of . . . PFOA" beginning as early as the 1980s. Id. ¶ 112.

### 2.  Contamination of Hoosick Falls

The Village of Hoosick Falls operates a "municipal water system" and provides around 95% of Hoosick Falls residents with water. Id. ¶¶ 121–22. Numerous facilities "in and around

Hoosick Falls" have used PFOA "in manufacturing processes," including the McCaffrey Site, which began operating in 1961. Id. ¶¶ 125–27. In 1986, Honeywell, then known as Allied-Signal, purchased Oak Materials Group, Inc., inheriting its assets, including the McCaffrey Site. Id. ¶ 129. In 1996, Honeywell sold the McCaffrey Site to Furon Company. Id. ¶ 130. In 1999, Saint-Gobain purchased Furon and became the owner of the McCaffrey Site. Id. ¶ 131.

Since 1961, the companies operating the McCaffrey Site have utilized "PFOA manufactured by defendants DuPont and 3M" in the Site's manufacturing processes. Id. ¶ 133. When manufacturing "stain-resistant fabric," employees of these companies created "a liquid solution containing PFOA," and placed the solution in trays. Id. ¶ 134–35. During the process of applying PFOA to the fabric, "heat would vaporize a portion of the PFOA," which was exhausted from the Site "as fine particulate matter that was then transported by wind to the community." Id. ¶ 136. Employees at the Site washed the trays containing the PFOA solution on a daily basis, and the PFOA solution flowed into drains and, consequently, into the soil and the aquifer. Id. ¶ 137. Moreover, during the manufacturing process for various PFOA-infused products, the companies who operated the McCaffrey Site used six "three-story ovens," and they cleaned one oven and its stacks (the "internal tubing" of the oven) each week. Id. ¶¶ 143–45. The employees washed the stacks "in a large sink," and the "waste water from the cleaning was discharged down a drain," which eventually "resulted in the discharge of PFOA into the soil and, in turn, into the aquifer." Id. ¶ 146. Plaintiffs maintain, "[u]pon information and belief, . . . the majority of PFOA used by . . . Saint-Gobain and Honeywell was purchased from and/or manufactured by . . . DuPont and 3M." Id. ¶ 152.

In 2007, Hoosick Falls built a "production well to supply municipal water" to its residents, which stands around 500 yards away from the McCaffrey Site. Id. ¶¶ 154–55. In 2014 and 2015, Hoosick Falls tested the municipal water and determined that the water contained "high concentrations of PFOA." Id. ¶¶ 156–59. Specifically, the tests revealed PFOA concentrations of 151, 612, 618, 620, and 662 parts per trillion ("ppt") of PFOA. Am. Compl. ¶ 160. As a point of comparison, in 2009, the EPA promulgated a "provisional health advisory" which stated that "short term . . . exposure to PFOA at a concentration of 400 ppt can cause human health effects." Id. ¶ 113. In May 2016, the EPA issued a "lifetime advisory" stating that, when PFOA is present in a water supply at a concentration of over 70 ppt, public health officials should undertake remediation of the water supply and should inform users of the water "about the health risks associated with exposure to PFOA." Id. ¶ 117.

In October 2015, the regional EPA administrator learned about the test results at the Hoosick Falls municipal water supply. In November and December 2015, the EPA recommended that the Village use an "alternative drinking water source," and "further recommended that residents not use the municipal water for drinking and cooking." Id. ¶¶ 163–65. After the EPA's December warning, Saint-Gobain began providing Hoosick Falls residents with free bottled water, and agreed to pay for "a granulated activated carbon filter system on the municipal water system to remove PFOA from drinking water." Id. ¶ 169.

In its investigation of PFOA contamination in Hoosick Falls, the New York Department of Environmental Conservation ("DEC") observed that PFOA leached "from the former municipal landfill," which is adjacent to the Hoosick River. Id. ¶ 150. The leachate "continues to migrate towards and into the" river. Id. The DEC found a PFOA concentration of 21,000 ppt in

the leachate. Id. On January 27, 2016, the State Health Commissioner designated the McCaffrey Site as a state Superfund Site. Id. ¶ 178. In February 2016, state officials tested samples of water from private wells in Hoosick Falls, and 42 out of 145 wells tested contained water with PFOA concentration over 100 ppt. Id. ¶ 190.

### 3. Plaintiffs' Alleged Injuries

Plaintiffs maintain that "[v]irtually all of the long-time residents of Hoosick Falls who were using municipal water at the time of the discovery of the contamination had levels an order of magnitude . . . above background levels of PFOA in their blood serum." Id. ¶ 197. Furthermore, all current and former Hoosick Falls residents, "including [P]laintiffs, have been exposed in the past to PFOA at a level that meets or exceeds some health-based comparison value." Id. ¶ 198.

Kenneth Wickenden has lived in Hoosick Falls since 1998 and has consumed the Village of Hoosick Falls' municipal water since 1998 "for drinking, cooking, bathing, cleaning and other purposes." Id. ¶ 201. Kenneth also inhaled small particles of PFOA carried in the wind as a consequence of the McCaffrey Site Defendants' manufacturing processes. Id. ¶ 203. In August 2014, Kenneth was diagnosed with kidney cancer. Id. ¶ 205. In June 2016, the PFOA concentration in Kenneth's blood measured 113 ug/L. Id. ¶ 206. By comparison, Plaintiffs maintain that studies have revealed that the average PFOA blood level in the United States is 2.08 ug/L. Id. ¶ 195.

Shannon Wickenden has lived in Hoosick Falls since she was born. Id. ¶ 207. She moved into the same home as Kenneth in 1998. Id. ¶ 206. Since that date at the latest, Shannon has consumed Hoosick Falls' municipal water "for drinking, cooking, bathing, cleaning and other

purposes." Id. Shannon, like Kenneth, inhaled PFOA carried in the wind as particulate matter. Id. ¶ 208. In June 2016, the PFOA concentration in Shannon's blood measured 61.7 ug/L. Id. ¶ 210. Accordingly, Plaintiffs allege that she "has suffered a toxic invasion and accumulation of PFOA in her body." Id. ¶ 209.

### B. Procedural History

On September 21, 2017, Plaintiffs commenced this action against 3M, DuPont, and the McCaffrey Site Defendants. Dkt. No. 1 ("Complaint"). Plaintiffs filed their Amended Complaint on March 19, 2018. Am. Compl. The Amended Complaint brings a strict products liability claim against 3M and DuPont premised on their alleged failure to provide adequate warnings regarding the hazardous nature of PFOA. Id. ¶¶ 211–227. The Amended Complaint also alleges negligence claims against each defendant, premised on 3M and DuPont's failure to warn and the McCaffrey Site Defendants' PFOA disposal practices. Id. ¶¶ 228–48. The Amended Complaint also alleges trespass claims against the McCaffrey Site Defendants. Id. ¶¶ 249–54. Defendants moved to dismiss. DuPont Mot.; 3M Mot.; McCaffrey Site Defs.' Mot.; Dkt. Nos. 64-1 ("DuPont Memorandum"); 65-1 ("McCaffrey Site Defendants' Memorandum"); 66-1 ("3M Memorandum"). Defendants argue that Plaintiffs' claims are time-barred. DuPont Mem. at 14; 3M Mem. at 3; McCaffrey Site Defendants' Mem. at 4–19. DuPont and 3M also argue that Plaintiffs fail to allege the duty and causation elements of a strict products liability or negligence claim. 3M Mem. at 6–9; DuPont Mem. at 5–13. Plaintiffs opposed the Motions, Dkt. Nos. 70 ("McCaffrey Site Defendants' Response"), 71 ("DuPont and 3M Response"), and Defendants replied, Dkt. Nos. 74 ("McCaffrey Site Defendants' Reply"), 75 ("3M Reply"), 76 ("DuPont Reply").

### III.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the nonmoving party. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the action is subject to dismissal. Id. at 678–79.

### IV.    DISCUSSION

#### A.  Statute of Limitations

Plaintiffs allege that Kenneth developed kidney cancer and Shannon accumulated a substantial amount of PFOA in her body as a result of 3M and DuPont's failure to warn and the McCaffrey Site Defendants' contamination of the Village's water supply, air, and soil with PFOA. Am. Compl. ¶¶ 205, 210. The McCaffrey Site Defendants argue that Plaintiffs' claims are untimely under New York Civil Practice Law and Rules ("CPLR") § 214-c. McCaffrey Site

9

Defs.' Mem. at 4–8. Additionally, the McCaffrey Site Defendants argue that Plaintiffs cannot

rely on CPLR § 214-f to revive their claims because construing this provision to revive time-

barred claims would violate the Due Process Clause of the New York State Constitution. Id. at

10–19. DuPont and 3M join the McCaffrey Site Defendants' statute of limitations arguments.

DuPont Mem. at 15; 3M Mem. at 5.

    "When a defendant raises a statutory bar such as the statute of limitations as an

affirmative defense, dismissal under Rule 12(b)(6) is appropriate if 'it is clear from the face of

the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims

are barred as a matter of law.'" NXIVM Corp. v. Foley, No. 14-CV-1375, 2015 WL 12748008,

at *5 (N.D.N.Y. Sept. 17, 2015) (Kahn, J.) (quoting Staehr v. Hartford Fin. Servs. Grp.,

547 F.3d 406, 425 (2d Cir. 2008)). Because the statute of limitations is an affirmative defense, a

defendant bears the burden of showing that a claim is untimely. Bano v. Union Carbide Corp.,

361 F.3d 696, 710 (2d Cir. 2004).

    Without deciding whether Plaintiffs' claims are time-barred under § 214-c, the Court

finds that their claims are timely under § 214-f and that § 214-f does not offend due process.

Section 214-f provides that "an action to recover personal damages for injury caused by contact

with or exposure to any substance or combination of substances contained within an area

designated as a superfund site" under New York or federal law "may be commenced by the

plaintiff within the period allowed pursuant to [§ 214-c] or within three years of such designation

of such an area as a superfund site, whichever is latest."

    Plaintiffs' claims are plainly timely under § 214-f because they commenced this action on

September 21, 2017, Compl., less than two years after New York designated the McCaffrey Site

as a state Superfund Site, Am. Compl. ¶ 178. However, Defendants argue that, by reviving claims that are otherwise untimely, § 214-f violates their due process rights under the New York State Constitution. McCaffrey Site Defs.' Mem. at 9–19; 3M Mem. at 6 (joining the McCaffrey Site Defendants' arguments regarding the statute of limitations); DuPont Mem. at 15–16 (same).

The Court addressed this due process challenge in Sweener v. Saint-Gobain Performance Plastics Corp., No. 17-CV-532, 2018 WL 748742, at *7–8 (N.D.N.Y. Feb. 7, 2018) (Kahn, J.). There, the Court relied on the New York Court of Appeal's decision in In Re World Trade Center Lower Manhattan Disaster Site Litigation, which stated that "a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice." Id. at *7 (quoting In Re World Trade Ctr. Lower Manhattan Disaster Site Litig., 89 N.E.3d 1227, 1243 (N.Y. 2017)). The Court found that § 214-f satisfied this standard. Id. at *8. It stated that the statute "was enacted to allow individuals such as [the p]laintiff, who suffer latent injuries stemming from environmental contamination, to pursue claims that would otherwise be time-barred simply because a defendant's tortious conduct was unknown." Id. It also found that "[a]llowing such plaintiffs three years after the designation of a Superfund site in which to bring their claims is plainly reasonable under New York law." Id.

Just as the Court rejected this due process challenge in Sweener, it does the same here. Section 214-f does not offend Defendants' due process rights, and Plaintiffs' claims are timely under the statute. Because Plaintiffs' claims are timely, the Court turns to address their three causes of action.

11

### B.  Strict Products Liability Claims

Plaintiffs allege a strict products liability claim against 3M and DuPont under New York state law based on a failure to warn theory. Am. Compl. ¶¶ 211–27. They state that, by the mid-1980s, 3M and DuPont "were aware of the health hazards associated with PFOA exposure as well as the potential for PFOA to contaminate drinking water," and that the companies knew that they could have implemented strategies to either reduce the discharge of PFOA from facilities like the McCaffrey Site or to replace PFOA "with another surfactant." Id. ¶ 216. Plaintiffs then allege that, despite this knowledge, 3M and DuPont continued selling PFOA without informing "purchasers of the true hazards of PFOA or instruct[ing] them about and recommend[ing] emission reducing technologies because of concerns for loss of profits to these Defendants." Id.

"Under New York law, a plaintiff may assert a claim for strict products liability on grounds that a product is 'defective because of a mistake in the manufacturing process . . . or because of an improper design . . . or because the manufacturer failed to provide adequate warnings regarding the use of the product.'" Amos v. Biogen Idec Inc., 28 F. Supp. 3d 164, 169–70 (W.D.N.Y. 2014) (quoting Voss v. Black & Decker Mfg. Co., 450 N.E.2d 204, 207 (N.Y. 1983)). "To state a *prima facie* case of liability on the basis of a defendant's failure to warn, the plaintiff must establish that '(1) the manufacturer had a duty to warn; (2) the manufacturer breached the duty to warn in a manner that rendered the product defective, i.e., reasonably certain to be dangerous; (3) the defect was the proximate cause of the plaintiff's injury; and (4) the plaintiff suffered loss or damage.'" Id. (quoting Bee v. Novartis Pharm. Corp., 18 F. Supp. 3d 268, 282–83 (E.D.N.Y. 2014)).

DuPont and 3M argue in their Motions that Plaintiffs fail to adequately allege the duty or causation elements of a failure to warn claim. 3M Mem. at 6–9; DuPont Mem. at 6–14. The Court addresses these arguments below.

### 1. Duty

"A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." In re N.Y.C. Asbestos Litig., 59 N.E.3d 458, 470 (N.Y. 2016) ("Asbestos II") (quoting Liriano v. Hobart Corp., 700 N.E.2d 303, 305 (N.Y. 1998)). This duty requires the manufacturer to "issue warnings" regarding "hazards arising from foreseeable uses of the product about which the manufacturer learns after the sale of the product." Id. The manufacturer's duty extends not only to the "original or ultimate purchasers of the product," but also "to employees of those purchasers, and to third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn." Id. (quoting McLaughlin v. Mine Safety Appliances Co., 181 N.E.2d 430, 433 (N.Y. 1962)).

### a.  Duty to Warn and Third Persons

The Court here clarifies a misunderstanding that the parties appear to share regarding a manufacturer's duty to warn with respect to third persons. Plaintiffs suggest that a manufacturer has a duty to provide a warning regarding the hazards of a product directly to bystanders exposed to a foreseeable risk of harm by the product. DuPont and 3M Resp. at 12. 3M and DuPont apparently share this understanding of a duty to warn bystanders because these defendants suggest that, if a duty to warn extended to bystanders, manufacturers would be  required to "warn the general public," which would be too expansive a formulation of duty. DuPont Reply at 1; 3M Mem. at 7. Furthermore, these defendants argue that manufacturers owe no duty to warn people

other than users or purchasers of their products absent a special relationship between the manufacturer and the bystander. DuPont Mem. at 10; 3M Mem. at 8.

Although New York caselaw states that the manufacturer's duty to warn extends "to third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn," Asbestos II, 59 N.E.3d at 470 (citations omitted), this does not mean that, when a bystander is exposed to such a risk, the manufacturer has a duty to directly warn the bystander. Rather, a duty to warn with respect to bystanders simply requires the manufacturer to warn the purchasers or users of the product so that the purchasers or users operate the product in a manner that reduces the bystander's exposure to a foreseeable risk of harm. LaPaglia v. Sears Roebuck and Co., Inc., 531 N.Y.S.2d 623, 626 (App. Div. 1988). This duty is not contingent, as 3M and DuPont suggest, on the existence of a special relationship between the manufacturer and the bystander. Nor is the existence of this duty akin to a duty to society at large.

For instance, in Bah v. Nordson Corp., the plaintiff's coworker cleaned out the nozzle of a hot glue dispensing machine while the machine was still turned on, which was apparently hazardous. No. 00-CV-9060, 2005 WL 1813023, at *3 (S.D.N.Y. Aug. 1, 2005). During the cleaning, hot glue sprayed from the machine and injured the plaintiff. Id. The plaintiff brought an action against the machine's manufacturer for its "alleged failure to provide adequate warnings about the danger of cleaning the nozzles while the machine was in operation." Id. The court rejected the manufacturer's argument that it owed no duty to warn to the plaintiff because she "was not a user of the subject machine but only a bystander." Id. at *15. The court observed that a manufacturer's "duty to warn requires him 'to give to those who are to use the chattel the information . . . which he should realize to be necessary to make its use safe for them and *those*

14

*in the vicinity it is to be used.*" Id. (quoting Restatement 2d Torts § 388 cmt. g (1965)). Similarly, in LaPaglia, the court held that a bystander injured by an object flung from a lawnmower could bring an action against the manufacturer for failing to provide adequate warnings to the user of the lawnmower. 531 N.Y.S.2d at 626.

Following the reasoning in these cases, if the Court recognizes that DuPont and 3M had a duty to warn that Plaintiffs could invoke as bystanders, that duty would not require DuPont and 3M to warn every foreseeable bystander. Rather, this duty would require these defendants to inform the McCaffrey Site Defendants and their employees—the purchasers and users of DuPont and 3M's PFOA—about the risks that PFOA poses to foreseeable bystanders and about techniques that could be employed to reduce these risks.

### b. Existence and Scope of 3M and DuPont's Duty to Warn

Plaintiffs allege that 3M and DuPont owed a duty to warn because the harms associated with PFOA use were foreseeable. 3M and DuPont Resp. at 13. 3M and DuPont correctly observe that the foreseeability of harm, while relevant to the scope of an already existing duty, does not establish the existence of duty. 3M Mem. at 7; DuPont Mem. at 9–10; see, e.g., In re N.Y.C. Asbestos Litig., 840 N.E.2d 115, 119 (N.Y. 2005) ("Asbestos I") ("[F]oreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist."); Asbestos II, 59 N.E.3d at 478 (stating that the "suggest[ion] that the existence of a duty to warn turns on foreseeability alone . . . run[s] afoul of our clear precedent to the contrary"). Typically, when fashioning a duty:

> the court must settle upon the most reasonable allocation of risks,
> burdens and costs among the parties and within society, accounting
> for the economic impact of a duty, pertinent scientific information,

15

> the relationship between the parties, the identity of the person or
> entity best positioned to avoid the harm in question, the public policy
> served by the presence or absence of a duty and the logical basis of a
> duty.

Id. at 470.

While 3M and DuPont are correct that Plaintiffs may not rely solely on the foreseeability

of harm to allege that these defendants owed a duty to warn, the Court finds that Plaintiffs'

allegations support the existence of a duty to warn based on application of the factors discussed

in Asbestos II. First, the court "must consider whether [3M and DuPont are] in a superior

position to know of and warn against . . . hazards" associated with PFOA, because "in all failure-

to-warn cases, this is a major determinant of the existence of the duty to warn." Id. at 471–72.

3M began manufacturing PFOA in the 1950s, and 3M and DuPont researched the health and

environmental hazards of this substance for decades. Am. Compl. ¶¶ 209–12. Given their

heightened familiarity with PFOA and its associated hazards, 3M and DuPont were, compared to

purchasers of PFOA and their employees, in a superior position to know of and warn against

these hazards. See Liriano v. Hobart Corp., 700 N.E.2d 303, 307 (N.Y. 1998) ("Compared to

purchasers and users of a product, a manufacturer is best placed to learn about post-sale defects

or dangers discovered in use."). Moreover, concerning the economic impact of acknowledging

the existence of a duty to warn, the Court of Appeals has already determined that the imposition

of this duty "has not imposed extreme or unreasonable financial liability on manufacturers."

Asbestos II, 59 N.E.3d at 473. Furthermore, even if the existence of a duty would expose 3M and

DuPont to considerable financial liability, "[w]here the foreseeable risks of a product's use are

sufficiently serious—particularly to large numbers of people—courts have not hesitated to

require manufacturers to face substantial costs in warnings, testing, inspection, and safety design." Hall v. E.I. Du Pont Nemours & Co., Inc., 345 F. Supp. 353, 366 (E.D.N.Y. 1972).

Moreover, while the Court acknowledges that it should avoid fashioning a duty that would "subject defendants to unlimited liability to an indeterminate class of potential victims," DuPont Mem. at 3 (quoting Aqua N.Y. of Sea Cliff v. Buckeye Pipeline Co., No. 12188/11, 2012 N.Y. Misc. LEXIS 6851, at *25 (Sup. Ct. N.Y. Sept. 4, 2011)), DuPont and 3M's duty to warn would not be so expansive. Taking Plaintiffs' allegations as true, DuPont and 3M knew that PFOA discharged from facilities operated by purchasers of PFOA, like the McCaffrey Site Defendants, would travel through the air and through groundwater, and it was foreseeable that nearby residents would consume PFOA by inhaling or drinking non-trivial amounts of the substance. DuPont and 3M are not subject to unlimited liability, because their duty to warn is limited to warning purchasers and users of PFOA, and the only bystanders who may invoke this duty as a basis for liability are those exposed to an unreasonable and foreseeable risk of harm from the substance—those people living near facilities operated by those purchasers and users.

Finally, the Court rejects DuPont's argument that Plaintiffs' claim should be dismissed because "[t]otally absent from the Amended Complaint is an allegation that DuPont owed Plaintiff[s] a legal duty." DuPont Mem. at 9. At this stage, Plaintiffs are required to allege *facts* that, taken as true, state a claim upon which relief may be granted. Iqbal, 556 U.S. at 678. Plaintiffs are not required to plead legal conclusions, such as a paragraph explicitly stating that Defendants owed them a legal duty. See also 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia, 750 N.E.2d 1097, 1101 (N.Y. 2001) ("The existence and scope of a tortfeasor's duty is, of course, a legal question for the courts.").

In sum, the Court finds that 3M and DuPont were in a superior position to know of and warn purchasers and users of PFOA of the hazards associated with this substance, that the economic impact of recognizing such a duty would not be overly burdensome, and that 3M and DuPont's liability would not be infinite or indeterminate. Therefore, the Court finds that Plaintiffs have sufficiently alleged the existence of a duty.

### 2. Causation

3M and DuPont argue that Plaintiffs' strict products liability claim should fail because they fail to "identify the exact defendant" who supplied the PFOA that "caused [their] injur[ies]." DuPont Mem. at 12; see also 3M Mem. at 9. To allege the causation prong of a strict products liability claim, a plaintiff must allege that the product's "defect was a substantial factor in bringing about [her] injury or damages." Ohuche v. Merck & Co., Inc., No. 11-CV-2385, 2011 WL 2682133, at *2 (S.D.N.Y. July 7, 2011) (quoting Voss, 450 N.E.2d at 207). The plaintiff must also allege facts indicating "that it is reasonably probable, not merely possible or evenly balanced, that the defendant was the source of the offending product." Healey v. Firestone Tire & Rubber Co., 663 N.E.2d 901, 903 (N.Y. 1996).

Here, the Court finds that Plaintiffs have sufficiently alleged that it is reasonably probable that their injury was caused by PFOA manufactured by 3M and DuPont. Plaintiffs allege, "[u]pon information and belief, the majority of PFOA used by defendants Saint-Gobain and Honeywell was purchased from and/or manufactured by defendants DuPont and 3M." Am. Compl. ¶ 152. DuPont does not acknowledge this allegation, and 3M asserts that this statement only suggests that "it is 'merely possible' that PFOA supplied by 3M caused Plaintiff's alleged injuries." 3M Mem. at 9 (quoting Healey, 663 N.E.2d at 903).

18

The Court finds the causation discussion in asbestos exposure cases instructive. In Kreppein v. Celotex Corp., the plaintiff sued four asbestos manufacturers, including Celotex, alleging that her husband's death was caused by exposure to absbestos at a shipyard. 969 F.2d 1424, 1425–26 (2d Cir. 1992). The Second Circuit panel rejected Celotex's assertion that the plaintiff "failed to prove specifically that Celotex or Philip Carey [Celotex's predecessor] products, as distinct from other asbestos-containing products, injured her husband." Id. at 1425. The court observed that it regularly "found proof of causation sufficient [in asbestos cases] not withstanding the lack of identification of the precise product that injured a given plaintiff." Id. at 1462. The court summarized the testimony of several of the decedent's co-workers who asserted that they worked at the same shipyard at the same time as the decedent, and regularly worked with Philip Carey asbestos products. Id. at 1426. The court concluded that this testimony "supports a finding that [the decedent] was exposed to asbestos dust from Philip Carey products," and approved the jury's finding of causation despite the possibility that the decedent was also exposed to asbestos dust produced by other manufacturers. Id.

Similarly, in O'Brien v. National Gypsum Co., the Second Circuit found that the plaintiff established that Philip Carey's asbestos caused her husband's death even though he was likely exposed to asbestos from a number of manufacturers while working at the Brooklyn Navy Yard. 944 F.2d 69, 72–73 (2d Cir. 1991). The court held that, because the decedent worked in the Brooklyn Navy Yard, and Philip Carey products were used "at the Navy Yard during the relevant period," and "asbestos products were used interchangeably on virtually all of the warships under construction in the Navy Yard, [the decedent's] disease might reasonably be attributed in part to exposure to Philip Carey products." Id. See also Millerman v. Georgia Pacific Corp., 625

19

N.Y.S.2d 29, 30 (App. Div. 1995) ("Certainly, plaintiff has submitted adequate proof that defendant's predecessor was likely to have furnished the asbestos products *that were among those* to which plaintiff was exposed. 'The plaintiff is not required to show the precise causes of his damages, but only to show facts and conditions from which defendant's liability may be reasonably inferred.'" (emphasis added) (quoting Matter of N.Y.C. Asbestos Litig. [Brooklyn Nav. Shipyard Cases], 593 N.Y.S.2d 43 (App. Div. 1993))).

These cases clarify that Plaintiffs are not required to allege that they *only* consumed PFOA manufactured by 3M or DuPont, or that there were no other proximate causes of their injuries. Rather, because Plaintiffs have alleged that 3M and DuPont produced the majority of the PFOA used—and eventually discharged into the environment—by the McCaffrey Site Defendants, it is reasonable to infer that much of the PFOA in the water and in the air around Hoosick Falls was produced by 3M and DuPont. It is also reasonable to infer that much of the PFOA accumulated in Plaintiffs' bodies came from PFOA manufactured by DuPont and 3M. It is irrelevant that the Amended Complaint leaves open the possibility that Plaintiffs also consumed PFOA sold to the McCaffrey Site Defendants by other suppliers. It is enough that Plaintiffs have alleged sufficient facts for the Court to infer that it is "reasonably probable" that their exposure to PFOA supplied by 3M and DuPont contributed to their injury. Healey, 663 N.E.2d at 903. Accordingly, for the purposes of a motion to dismiss, the Court finds that Plaintiffs adequately allege that PFOA manufactured by DuPont and 3M caused their injuries.

### C. Negligence Claims

Plaintiffs allege negligence claims against Defendants. Am. Compl. ¶¶ 224–44. Their negligence claims against 3M and DuPont are premised on the same facts as their failure to warn

claim described above. Id. ¶¶ 232–33. 3M and DuPont move to dismiss Plaintiffs' negligence claims for the same reasons described in the strict products liability discussion. DuPont Mem. at 5–6; 3M Mem. at 6. "New York courts generally consider strict products liability and negligence claims to be 'functionally synonymous.'" Pinello v. Andreas Stihl Ag & Co. KG, No. 08-CV-452, 2011 WL 1302223, at *16 (N.D.N.Y. Mar. 31, 2011) (citing Penny v. Ford Motor Co., 662 N.E.2d 730 (N.Y. 1995)). Therefore, for the reasons discussed in the strict products liability section, the Plaintiffs' negligence claims survive dismissal.

### D. Medical Monitoring and Property Damage Claims

Plaintiffs allege that Shannon "suffered a toxic invasion and accumulation of PFOA in her body" by ingesting PFOA through the water and air since 1998 at the latest. Am. Compl. ¶¶ 206, 209. Also, Plaintiffs seek "[c]onsequential damages against all defendants for the costs of medical monitoring." Id. at 47. Furthermore, Plaintiffs seek compensatory damages in part based on "property damage caused by [D]efendants' negligent . . . and/or intentional conduct." Id.

The McCaffrey Site Defendants challenge Plaintiffs' medical monitoring and property damage claims by reasserting arguments they made before this Court in Baker v. Saint-Gobain Performance Plastics Corp., 232 F. Supp. 3d 233 (N.D.N.Y. 2017) (Kahn, J.). McCaffrey Site Defs.' Mem. at 19–20. DuPont also references the McCaffrey Site Defendants' arguments to challenge Plaintiffs' medical monitoring claims. DuPont Mem. at 15 n.9. For the reasons detailed at length in Baker, the Court again rejects these challenges to Plaintiffs' request for medical monitoring and their request for compensation for property damage. See Baker, 232 F. Supp. 3d at 244–46 (permitting Hoosick Falls plaintiffs to maintain "claims for negligence and strict

liability based on property damage" against the McCaffrey Site Defendants), 249–53 (rejecting the McCaffrey Site Defendants' challenge to medical monitoring claims).

Moreover, DuPont, in a single sentence in a footnote, states that Plaintiff should not be able to seek compensation for property damage because "Plaintiffs' property was not alleged to have been 'directly affected' by DuPont's conduct." DuPont Mem. at 15 n.9 (citing Baker, 232 F. Supp. 3d at 245–46). This assertion is wholly undeveloped and plainly contradicted by the cited passage in Baker. In Baker, this Court found that the plaintiffs could seek property damages for the allegedly wrongful conduct of the McCaffrey Site Defendants, reasoning that, "where Plaintiffs allege that the water supply for their property has been contaminated by the acts of Defendants and that the contaminant in question causes negative health consequences, the stigma causing a decline in Plaintiff's property values is directly traceable to Defendants' conduct." Baker, 232 F. Supp. 3d at 246.

Although Baker only discussed the impact of the McCaffrey Site Defendants' conduct on property values, its reasoning is no less applicable to DuPont's conduct. Taking Plaintiffs' allegations as true, DuPont sold to the McCaffrey Site Defendants much of the PFOA that eventually contaminated Hoosick Falls' municipal water supply, which was the water supply for Plaintiffs' home. Am. Compl. ¶¶ 153, 201, 206. As explained in the strict products liability section, the contamination of the water supply and, consequently, the stigmatic reduction in Plaintiffs' property value, is directly traceable to DuPont and 3M's alleged failure to provide adequate warnings regarding the health effects and proper handling of PFOA. Accordingly, the Court rejects DuPont's assertion that Plaintiffs cannot seek compensation for property damage.

### E.  Spousal Derivative Claim

Plaintiffs allege that they have been married at least since Kenneth was diagnosed with kidney cancer in 2014, and that, because of Defendants' conduct, "Shannon . . . has been caused to lose the comfort, companionship, society, services and consortium of the other caused by the illnesses and injuries their spouse has suffered." Am. Compl. ¶¶ 256–57. DuPont argues that Shannon's spousal derivative claim should be dismissed because such a claim cannot survive if the underlying tort claim is dismissed. DuPont Mem. at 16 (quoting Burrell v. AT&T Corp., No. 03-CV-2490, 2005 WL 2656124, at *4 (S.D.N.Y. Oct. 18, 2005)). However, because Plaintiffs' strict liability and negligence claims survive dismissal, DuPont's argument is unavailing. Accordingly, Shannon's spousal derivative claim survives dismissal.

## V.     CONCLUSION

**Accordingly, it is hereby:**

**ORDERED,** that DuPont's Motion (Dkt. No. 65) is **DENIED**; and it is further

**ORDERED**, that the McCaffrey Site Defendants' Motion (Dkt. No. 66) is **DENIED**; and it is further

**ORDERED**, that 3M's Motion (Dkt. No. 67) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     June 21, 2018
           Albany, New York

Lawrence E. Kahn
U.S. District Judge